# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE STATE OF NORTH CAROLINA,** ) <br> The North Carolina Department of Justice ) <br> Old Education Building ) <br> 14 West Morgan Street ) <br> P.O. Box 629 ) <br> Raleigh, North Carolina  27602-0629 ) <br> ) <br> *Plaintiff*, ) <br> ) <br> v. ) <br> ) <br> **JOHN ASHCROFT, in his official capacity as** ) <br> **Attorney General, and THE UNITED STATES** ) <br> **OF AMERICA,** ) <br> ) <br> *Defendants.* ) | **CASE NO.:** _____ <br> **JUDGES:** _____ |

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND REQUEST FOR THREE-JUDGE COURT

**NOW COMES** plaintiff, and complains and alleges as follows:

### Preliminary Matters

1.  This action is brought by plaintiff pursuant to § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c (hereinafter "§ 5"), and 28 U.S.C. § 2201.

2.  Plaintiff, the State of North Carolina, is a State of the United States of America and brings this duly authorized action on behalf of itself and the citizens of the State of North Carolina.

3.  Defendant John Ashcroft, Attorney General of the United States, is charged with certain responsibilities on behalf of defendant United States of America and pursuant to § 5,

including the defense of § 5 litigation in the United States District Court for the District of Columbia.

4.  Section 5 prohibits a jurisdiction subject to § 4(b) of the Act, 42 U.S.C. § 1973b(b), from enforcing "any voting qualification or prerequisite to voting; or standard, practice, or procedure with respect to voting different from that in force and effect on November 1, 1964," unless it has obtained a declaratory judgment from the United States District Court for the District of Columbia that such change "does not have the purpose of and will not have the effect of denying or abridging the right to vote on account of race or color" or has submitted the proposed change to the Attorney General of the United States and the Attorney General has not objected to the proposed change.

5.  The State of North Carolina is not itself a jurisdiction covered by and subject to the "preclearance" requirement of § 5, but forty of North Carolina's 100 counties are jurisdictions covered by and subject to the "preclearance" requirement of § 5. Those forty counties are: Anson, Beaufort, Bertie, Bladen, Camden, Caswell, Chowan, Cleveland, Craven, Cumberland, Edgecombe, Franklin, Gaston, Gates, Granville, Greene, Guilford, Halifax, Harnett, Hertford, Hoke, Jackson, Lee, Lenoir, Martin, Nash, Northampton, Onslow, Pasquotank, Perquimans, Person, Pitt, Robeson, Rockingham, Scotland, Union, Vance, Washington, Wayne, and Wilson. 28 C.F.R. § 51.4 and pt. 51 App. at 96-97(2002).

6.  This is an action for declaratory judgment, pursuant to 42 U.S.C. § 1973c and 28 U.S.C. § 2201, for the purpose of determining an actual controversy between the parties and to allow plaintiff to enforce certain laws at issue relating to the nomination and election of members of the General Assembly of the State of North Carolina.

7.  The subject matter of this action is based on 42 U.S.C. § 1973c and 28 U.S.C. § 1331.

8. Venue and jurisdiction are proper in this Court pursuant to § 5 of the Voting Rights Act, 42 U.S.C. §1973c and 28 U.S.C. § 2284.

9. This action is properly determinable by a district court of three judges in accordance with 42 U.S.C. §1973c and 28 U.S.C. § 2284.

## FACTS

10. Since November 1, 1964, the applicable date of § 5 coverage for the covered counties in North Carolina, the North Carolina General Assembly, pursuant to its authority under Article II, §§ 3 and 5, of the Constitution of North Carolina, has enacted legislation from time to time pertaining to the revision of districts for the two chambers of the General Assembly - the North Carolina Senate and the North Carolina House of Representatives.

11. Such revision of districts and reapportionment of Senators and Representatives has occurred after each decennial census, as required by Article II, §§ 3 and 5, of the Constitution of North Carolina.

12. The North Carolina General Assembly has authority under the Constitution of North Carolina to enact legislation to provide for the revision of districts for the North Carolina Senate and the North Carolina House of Representatives. N.C. CONST., art. II, § 20.

13. In 1966, North Carolina's legislative districts for the North Carolina Senate and the North Carolina House of Representatives were held unconstitutional based on federal one person, one vote requirements, as were the state constitutional provisions then governing the drawing of State House districts. *Drum v. Seawell*, 249 F. Supp. 877 (M.D.N.C. 1965), *aff'd*, 383 U.S. 831, 86 S. Ct. 1237, 16 L. Ed. 2d 298 (1966). As a result, in 1967 the General Assembly enacted proposed constitutional amendments to redefine the manner in which the General Assembly should proceed

each decade to draw new legislative districts based on the decennial census. Those proposed amendments provided that "[n]o county shall be divided in the formation of a" district for both House and Senate redistricting. 1967 N.C. Sess. Laws 640. These "whole county provisions" were submitted to the voters in 1968. Having been ratified by the voters, they ostensibly became part of the North Carolina Constitution and were carried over without substantive changes into the 1971 Constitution.

14. The whole county provisions were not initially submitted to the Department of Justice for preclearance under § 5. Nor were they precleared by virtue of litigation in the United States District Court for the District of Columbia.

15. On November 3, 1970, the voters of North Carolina ratified a new constitution, which became effective on July 1, 1971. The 1971 Constitution was promptly submitted to the United States Department of Justice and was precleared. However, the whole county provisions were not identified as changes by a clear statement identifying the difference between the whole county provisions and previous law, but were considered as carried over unchanged from the earlier Constitution as amended in 1968.

16. As a result of the enactment of the 1971 Constitution and its ratification by the voters, the whole county provisions were treated as part of the new Constitution, now numbered as Article II, §§ 3(3) and 5(3). Consequently, they were followed in the 1971 and 1981 redrawing of state legislative districts. In 1981, however, North Carolina was sued in a lawsuit challenging both congressional and legislative districts. One of the original claims in that litigation was that the State had failed to obtain preclearance of the whole county provisions as required by § 5 of the Voting Rights Act. *See Gingles v. Edmisten*, 590 F. Supp. 345, 350 (E.D.N.C. 1984) (three-judge court)

(hereafter "*Gingles*"), *aff'd in part and rev'd in part on other grounds*, *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986) (hereafter "*Thornburg*"). Faced with that litigation, the State then submitted the whole county provisions to the United States Attorney General, seeking their preclearance. In submitting the whole county provisions, North Carolina presented the argument that the amendments did not constitute a change from the longstanding practice of drawing legislative districts without dividing counties. Nevertheless, the United States Department of Justice objected to the language prohibiting the division of counties and denied preclearance to the whole county provisions or to districting plans enacted in reliance on those provisions, noting that it was "unable to conclude that the 1968 amendments requiring nondivision of counties in legislative redistricting does not have a racially discriminatory purpose or effect." This objection forced North Carolina to redraw its legislative districts.

17.     Once North Carolina enacted its new plans in 1982, a suit was brought by Forsyth County residents who complained about the division of Forsyth County in the newly-drawn legislative districts. Specifically, they claimed that the State could not divide Forsyth County because it is not among the forty "covered" counties for purposes of § 5 preclearance. Their claim was rejected by a unanimous federal panel in *Cavanagh v. Brock*, 577 F. Supp. 176, 182 (E.D.N.C. 1983) (three-judge court). The three-judge court in *Cavanagh* held that the denial of preclearance to the whole county provisions meant that the provisions were not effective anywhere in North Carolina, insofar as they prohibited the division of counties in the drawing of legislative districts. The court reached its decision by applying North Carolina state law principles of severability, concluding that the unenforceability of the prohibition on dividing counties as to some districts

involving forty counties was necessarily inconsistent with applying them to the remaining districts. *Id*. at 181-82.

18. Following *Cavanagh* and until May, 2002, legislative districts in North Carolina were drawn dividing counties as necessary.

19. The results of the 2000 decennial census became generally available to the State of North Carolina from the Census Bureau of the United States Department of Commerce on or about March 21, 2001. On November 13, 2001, the North Carolina General Assembly enacted new districting plans for the North Carolina Senate and the North Carolina House of Representatives using new census statistics. The 2001 districting plans received § 5 preclearance from the United States Attorney General on February 11, 2001.

20. The 2001 legislative districting plans were challenged in state court on state law grounds; the challenge to the plans was based in part upon the plans' failure to comply with the State Constitution's whole county provisions. Following a hearing on cross-motions for summary judgment, the trial court declared the 2001 legislative districting plans to be in violation of the whole county provisions of the North Carolina Constitution. On April 30, 2002, after an expedited briefing and oral argument schedule, the North Carolina Supreme Court affirmed the trial court. *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377 (2002) ("*Stephenson I*"). The court further rejected the *Cavanagh* decision and held that the whole county provisions are, in fact, enforceable except to the extent necessary to comply with the Voting Rights Act. *Id*.

21. The North Carolina Supreme Court, interpreting the North Carolina Constitution, further mandated for the first time a series of nine criteria that must be present in any legislative districting plan in order for the plan to be valid under the North Carolina Constitution:

[1.] To ensure full compliance with federal law, legislative districts required by the Voting Rights Act ("VRA") shall be formed prior to creation of non-VRA districts; to the maximum extent practicable, however, such VRA districts shall also comply with the legal requirements of the whole county provisions.

[2.] In forming new legislative districts, any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal one person, one vote requirements.

[3.] In counties having a 2000 census population sufficient to support the formation of one non-VRA legislative district, the whole county provisions require that the physical boundaries of any such non-VRA legislative district not cross or traverse the exterior geographic line of any such county.

[4.] When two or more non-VRA legislative districts may be created within a single county, compact single-member non-VRA districts that do not traverse the exterior geographic boundary of any such county must be formed within that county.

[5.] In counties having a non-VRA population pool that cannot support at least one legislative district or, alternatively, in counties having a non-VRA population pool which, if divided into districts, would not comply with the one person, one vote standard, the requirements of the whole county provisions are met by combining or grouping the minimum number of whole, contiguous counties necessary to comply with the at or within plus or minus five percent one person, one vote standard. Within any such contiguous multi-county grouping, compact districts must be formed, consistent with the at or within plus or minus five percent standard, whose boundary lines do not cross or traverse the "exterior" line of the multi-county grouping. The resulting interior county lines created by any such groupings may be crossed or traversed in the creation of districts within said multi-county grouping but only to the extent necessary to comply with the at or within plus or minus five percent one person, one vote standard.

[6.] So that the intent underlying the whole county provisions will be enforced to the maximum extent possible, only the smallest number of counties necessary to comply with the at or within plus or minus five percent one person, one vote standard shall be combined into the county groupings.

[7.] Communities of interest should be considered in the formation of compact and contiguous electoral districts.

> [8.] Multi-member districts may not be used in the formation of legislative districts unless it is established that such districts are necessary to advance a compelling governmental interest.
>
> [9.] Any new redistricting plans may depart from strict compliance with the legal requirements set forth by the Supreme Court only to the extent necessary to comply with federal law.

*Stephenson I*, 355 N.C. at 383-84, 562 S.E.2d at 396-98.

22. The North Carolina Supreme Court remanded the action to the trial court with instructions to that court to hold an expedited hearing on the feasibility of allowing the General Assembly the first opportunity to develop new plans. *Id*. at 385, 562 S.E.2d at 398. However, the North Carolina Supreme Court also held that if the General Assembly was unable to develop revised constitutional plans meeting the guidelines established in *Stephenson I*, the trial court should adopt its own interim remedial plans and seek preclearance of any such plans from the United States Department of Justice. *Id*. The North Carolina Supreme Court also "authorized [the trial court] to take all necessary remedial actions to ensure that the primary elections for legislative offices are conducted in a timely and expeditious manner and consistent with the general election scheduled for 5 November 2002." *Id*. at 381 n.7, 562 S.E.2d at 395 n.7.

23. Consistent with the mandate of the North Carolina Supreme Court and following a hearing on May 8, 2002, the trial court concluded that sufficient time existed for the General Assembly to submit new redistricting plans and ordered that such plans be submitted by May 20, 2002.

24. The North Carolina General Assembly, which was not in regular session at the time, convened in a special session on May 17, 2002, and enacted new legislative districting plans. These plans were submitted to the Superior Court of Johnston County by the May 20, 2002, deadline.

25. On May 31, 2002, after a hearing, the Superior Court of Johnston County concluded that the 2002 revised legislative districting plans failed to satisfy the constitutional requirements specified in *Stephenson I*. Pursuant to the mandate of the North Carolina Supreme Court in *Stephenson I*, the superior court developed interim House and Senate redistricting plans and ordered that these plans be used only in the 2002 legislative elections. On May 21, 2002, the trial court submitted these interim plans to the United States Attorney General for § 5 preclearance. The trial court did not at that time submit for § 5 preclearance the *Stephenson I* opinion, with its nine redistricting criteria.

26. On June 13, 2003, the North Carolina State Board of Elections, the members and Executive Director of which were defendants in the *Stephenson* litigation, filed an action in this Court – *North Carolina State Board of Elections v. United States*, No. 02-1174 – alleging that the decision of the North Carolina Supreme Court in *Stephenson I*, as well as the whole county provisions of the North Carolina Constitution that the decision interpreted and declared enforceable, constituted changes in a "standard, practice, or procedure with respect to voting" for which preclearance under § 5 was required before the requirements of the decision, including enforcement of the whole county provisions, could be implemented. The complaint sought, pursuant to § 5, a declaratory judgment declaring whether the whole county provisions or the decision of the North Carolina Supreme Court satisfied the substantive standard of § 5. The complaint also submitted the interim plans adopted by the trial court for preclearance.

27. A three-judge panel consisting of the Honorable David S. Tatel, the Honorable Louis F. Oberdorfer, and the Honorable Gladys Kessler was assigned to hear *North Carolina State Board of Elections v. United States*.

28. Other persons who were parties to the *Stephenson* litigation moved to intervene in the action either as plaintiffs or as defendants, and were granted permission to do so. Various motions and proceedings were heard and conducted by the three-judge panel.

29. On June 21, 2002, the trial court supplemented its submission to the United States Attorney General by submitting for preclearance the whole county provisions of the North Carolina Constitution and the decision of the North Carolina Supreme Court in *Stephenson I*.

30. On July 12, 2002, the United States Attorney General, by letter to the trial judge, the Honorable Knox Jenkins, withdrew his 1981 objection to the whole county provisions of the North Carolina Constitution and granted preclearance for both the interim plans and the North Carolina Supreme Court's decision in *Stephenson I*. North Carolina's 2002 legislative elections were held using the interim plans adopted by the trial court.

31. As a result of the July 12, 2002, determinations by the United States Attorney General, the three-judge panel of this Court dismissed *North Carolina State Board of Elections v. United States* as moot on August 2, 2002.

32. On March 14, 2003, following oral argument before the North Carolina Supreme Court, that court certified the action back to the trial court for the purpose of making additional findings of fact to support its conclusions of law that the plans enacted by the General Assembly were unconstitutional. The trial court recertified the case, with additional findings of fact and conclusions of law, to the North Carolina Supreme Court on April 17, 2003. This supplemental order also identified constitutional defects in the court-drawn interim plans.

33. On July 16, 2003, within days of the scheduled adjournment of the North Carolina General Assembly's regular session, the North Carolina Supreme Court affirmed the decision of the

trial court rejecting the 2002 revised legislative districting plans for failure to comply with the requirements announced in *Stephenson I*. *See Stephenson v. Bartlett*, 357 N.C. 301, 582 S.E.2d 247 (2003) ("*Stephenson II*"). This decision by the North Carolina Supreme Court required the North Carolina General Assembly to draw new legislative districts for a third time since the 2000 decennial census.

34.   On November 24, 2003, in accordance with State law, the General Assembly convened in special session to consider matters related to redistricting. On November 25, 2003, 2003 Extra Session House Bill 3, which revised districts for the North Carolina Senate and for the North Carolina House of Representatives, was enacted by the North Carolina General Assembly. 2003 Extra Session House Bill 3 was signed by the Governor on that same date, and is codified as 2003 N.C. Sess. Laws 434 (Extra Session).[1]

35.   Neither the 2003 Senate Plan nor the 2003 House Plan can be implemented in North Carolina's sixty counties that are not covered by § 5 without also being implemented in the forty counties that are subject to § 5.

36.   Pursuant to § 5 of the Voting Rights Act, the 2003 Senate Plan and the 2003 House Plan cannot be implemented by plaintiff unless and until this Court enters a declaratory judgment, as prayed for by plaintiff.

---

[1]   2003 N.C. Sess. Laws 434 (Extra Session) also contains other election-related provisions that require preclearance under § 5. Preclearance for those remaining provisions will be sought separately through submission to the United States Department of Justice.

37. All Senators and Representatives in the North Carolina General Assembly serve for two year terms, with election to those offices occurring in November of even-numbered years and with those Senators and Representatives taking office in January of odd-numbered years.

38. State law currently provides that all candidates for both the Democratic and Republican nomination for the fifty seats in the North Carolina Senate and the 120 seats in the North Carolina House of Representatives, must declare their candidacy and file for nomination no earlier than noon on the second Monday in February and no later than noon on the last business day in February. N.C. GEN. STAT. § 163-106(c) (2001). The 2004 Democratic and Republican party primaries are, by statute, currently scheduled for May 4, 2003. N.C. GEN. STAT. § 163-1 (2001).

39. It is of the utmost importance to North Carolina and its citizens that this Court act upon plaintiff's claims at the earliest practicable date, and that an expedited dispositive motion or trial schedule be set, so that the merits of plaintiff's claims can be decided in sufficient time to allow for North Carolina to conduct its 2004 primary and general election in an orderly fashion. Counsel for plaintiffs will promptly consult with counsel for defendants in order to seek agreement on an expedited schedule.

## **COUNT I**

40. The allegations in paragraphs 1 through 39 are incorporated herein by reference as though fully set forth.

41. The 2003 Senate Plan, when compared to its "benchmark" plan, does not lead to retrogression in the position of racial minorities in North Carolina's forty counties covered under § 5,

therefore it does not have the effect of denying or abridging the right to vote on account of race or color.

42. The 2003 Senate Plan was not adopted with a retrogressive intent and accordingly does not have the purpose of denying or abridging the right to vote on account of race or color.

43. Plaintiff is entitled to a declaratory judgment that the 2003 Senate Plan has neither the purpose nor the effect of discriminating on the basis of race or color under § 5 of the Voting Rights Act of 1965, as amended, and that such legislation may be implemented without further delay.

## COUNT II

44. The allegations in paragraphs 1 through 39 are incorporated herein by reference as though fully set forth.

45. The 2003 House Plan, when compared to its "benchmark" plan, does not lead to retrogression in the position of racial minorities in North Carolina's forty counties covered under § 5, therefore it does not have the effect of denying or abridging the right to vote on account of race or color.

46. The 2003 House Plan was not adopted with a retrogressive intent and accordingly does not have the purpose of denying or abridging the right to vote on account of race or color.

47. Plaintiff is entitled to a declaratory judgment that the 2003 House Plan has neither the purpose nor the effect of discriminating on the basis of race or color under § 5 of the Voting Rights Act of 1965, as amended, and that such legislation may be implemented without further delay.

**WHEREFORE**, plaintiff respectfully prays that this Court:

1. Convene a three-judge panel to hear the matters raised by this complaint;

2. Issue such orders and convene such conferences as may be necessary on an expedited basis to ensure that discovery in this action be taken and completed as quickly as possible, and to ensure that a trial on the merits be had at the earliest possible date so that the State of North Carolina and its citizens can proceed in an orderly fashion in the conduct of elections and in filing for nomination to the public offices at issue, as well as to other public offices nomination to which may be affected by any delay in North Carolina's primary schedule;

3. Enter such other and further orders as may be necessary during the pendency of this case to ensure that it is handled as expeditiously as possible; and

4. Enter a declaratory judgment that the 2003 Senate Plan and the 2003 House Plan at issue have neither the purpose nor the effect of denying or abridging the right to vote on account of race or color, and that each of the statutes at issue may be enforced by plaintiff without any impediment on account of § 5 of the Voting Rights Act of 1965, as amended.

Respectfully submitted, this the 25th day of November, 2003.

ROY COOPER
ATTORNEY GENERAL

_____
Edwin M. Speas, Jr.
Special Counsel
N.C. State Bar No. 4112
espeas@ncdoj.com

        _____
Tiare B. Smiley
Special Deputy Attorney General
N. C. State Bar No. 7119
tsmiley@ncdoj.com


        _____
Alexander McC. Peters
Special Deputy Attorney General
N.C. State Bar No. 13654
apeters@ncdoj.com


        _____
Susan K. Nichols
Special Deputy Attorney General
N.C. State Bar No. 9904
snichols@ncdoj.com


N.C. Department of Justice
P.O. Box 629
Raleigh, N.C. 27602
(919) 716-6900